UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOSHUA BELLER, a minor by his next friend and mother, MELISSA WELCH, and MELISSA WELCH, Individually, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:03-cv-0889-TWP-TAB ) |
| HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, INDIANA d/b/a Wishard Memorial Hospital d/b/a Wishard Ambulance Service, | ) ) ) ) ) |
| Defendants. | ) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Health and Hospital Corporation of Marion County's, d/b/a Wishard Memorial Hospital d/b/a Wishard Ambulance Service ("Wishard"), Motion for Summary Judgment [Dkt. 57]. Plaintiff Melissa Welch ("Ms. Welch"), individually, and on behalf of her minor son Joshua Beller, or (collectively "Plaintiffs"), filed suit in this Court alleging that Wishard violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, by failing to stabilize Plaintiffs during an emergency medical situation. For the reasons set forth below, the Court **DENIES** Wishard's Motion for Summary Judgment.

**I. BACKGROUND**

This case involves Plaintiffs' claims under the EMTALA for injuries to Joshua Beller resulting from his birth. Joshua Beller suffered severe brain damage due to a lack of oxygen to his brain.

On June 14, 2001, twenty-six year old Ms. Welch was thirty-four weeks pregnant. Early that morning, around 5:25 a.m., Ms. Welch awoke, felt a gush of water, and felt the umbilical cord protruding between her legs. Ms. Welch had suffered a prolapsed umbilical cord, wherein part of the umbilical cord drops through the cervix into the vagina and possibly protrudes outside of the vagina. This is considered an emergency medical condition because it may impede oxygen flow to the unborn baby, resulting in brain damage or death.

Ms. Welch telephoned her doctor's office and spoke with a woman who identified herself as an obstetrics ("OB") nurse. The woman instructed Ms. Welch to immediately call 911. At 5:27 a.m. Ms. Welch called 911 and a Wishard ambulance arrived at the scene at 5:31 a.m. The ambulance operated under the Marion County EMS Protocols that allowed the ambulance to transport individuals to several different area hospitals.

Wishard employees Paramedic Lisa Warren ("Warren") along with Emergency Medical Technician Scott Wilbur ("Wilbur") treated Welch by following the Marion County Prolapsed Cord Protocol. Following the protocol, Warren and Wilbur positioned Ms. Welch in the knee-chest face down position to relieve pressure on the umbilical cord. While doing this, Ms. Welch gave Warren the telephone and Warren spoke with the OB nurse. The OB nurse asked Warren if she knew what she was doing, to which Warren responded that she did. The nurse told Warren that Ms. Welch needed to go to the closest appropriate hospital and asked Warren where the closest hospital was located. Warren stated that the nearest hospital was St. Francis Beech Grove, which was around the corner.

During transport, Warren called St. Francis Beech Grove and spoke with Monica Stone, M.D. ("Dr. Stone"). Warren advised Dr. Stone that the ambulance was transporting Ms. Welch

to the hospital. Dr. Stone informed Warren that the hospital did not have obstetrical facilities but gave Warren the "okay" to bring Ms. Welch to St. Francis Beech Grove.

After speaking with Warren, Dr. Stone called the St. Francis-South Campus ("South Campus") in Indianapolis to make sure that a physician would be at the facility because they had a patient who may need to be transferred. The South Campus had a state-of-the-art obstetrical facility and a Neonatal Intensive Care Unit ("NICU"), which St. Francis Beech Grove did not have. Following St. Francis' protocol, Dr. Stone also called the in-house family practice resident, Dr. Stephanie Kirts-Johnson ("Dr. Johnson").

At 5:48 a.m., Dr. Johnson met the ambulance team at the St. Francis Beech Grove Emergency Department. Ms. Welch was taken into the building and Dr. Johnson climbed upon the gurney to perform an examination, which revealed that Ms. Welch was only dilated enough to allow a loop of the umbilical cord to protrude out. To relieve pressure from the cord, Dr. Johnson used her fingers to split the vaginal sidewalls. The examination also revealed that Ms. Welch was not in labor; therefore, delivery was not imminent. Dr. Johnson determined that it was necessary to immediately transfer Ms. Welch to the South Campus for an emergency cesarean section where OB/GYN physician Dr. Scott Miles ("Dr. Miles") was standing by to perform a cesarean section.

Dr. Johnson told Ms. Welch that she needed to be transferred and explained the severity of the situation to Ms. Welch and the risks associated with transfer. According to Dr. Johnson, Ms. Welch verbally consented to the transfer. Ms. Welch and Dr. Johnson, who was still on the gurney attempting to relieve pressure on the umbilical cord, were then loaded back into the ambulance for transfer to the South Campus.

They arrived at the South Campus at 6:08 a.m. and were taken directly to the operating room. Dr. Miles performed the cesarean section and Joshua Beller was delivered at 6:16 a.m. where he was immediately handed off to the neonatal resuscitation team. Unfortunately, Joshua Beller suffered severe brain damage due to a lack of oxygen.

## II. <u>LEGAL STANDARDS</u>

**A. Summary Judgment**

Summary judgment is appropriate when "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Temain*, No. 2:09-CV-81-TLS, 2010 WL 5391578, at *1 (N.D. Ind. 2010) (quoting Fed. R. Civ. P. 56(a)). In arguing whether a fact can or cannot be genuinely disputed, a party must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials…." *Id.* at *2 (quoting Fed. R. Civ. P. 56(c)(1)).

A fact is material if it might affect the outcome of the suit. *Fanslow v. Chicago Mfg. Ctr., Inc.,* 384 F.3d 469, 478 (7th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). The substantive law controlling the case or issue identifies the facts that are material. *Id.* Thus, only disputes over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Id.*

The Court must draw all reasonable inferences from undisputed facts in favor of the non-moving party and view the disputed evidence in the light most favorable to the non-moving party. *First Bank & Trust v. Firstar Info. Servs., Corp.,* 276 F.3d 317, 322 (7th Cir. 2001). The non-moving party, however, may not rest upon mere allegations in the pleadings or upon conclusory testimony or affidavits; rather, he must go beyond the pleadings to support his

contentions with properly admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**B. Emergency Medical Treatment and Labor Act**

Although the EMTALA protects all individuals, the policy behind the EMTALA is to ensure that indigent and uninsured individuals receive emergency care. *Magruder ex. rel Magruder v. Jasper County Hosp.*, 243 F. Supp. 2d 886, 890 (N.D. Ind. 2003). "Congress was concerned that hospitals were 'dumping' patients who were unable to pay for care either by refusing to provide emergency treatment or by simply transferring those patients to other hospitals before the patient's condition was stabilized." *Id.*

The EMTALA imposes two duties on federally funded hospitals when an individual "comes to the emergency department" 42 U.S.C. § 1395dd(a). First, once an individual "comes to the emergency department … the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department." *Id.* Second, if an emergency medical condition is detected, "the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility…." *Id*. at § 1395dd(b). Thus, a hospital may violate the statute in either one of two ways: (1) through inadequate screening to detect the nature of the emergency condition; or (2) if the hospital fails to stabilize the emergency condition before releasing or transferring the patient. *DeBerry v. Sherman Hosp. Ass'n*, 741 F. Supp. 1302, 1305 (N.D. Ill. 1990).

Patients injured by violations of the EMTALA requirements are authorized to sue the hospital. § 1395dd(d)(2). However, the "EMTALA is not a federal malpractice statute." *Curry*

*v. Advocate Bethany Hosp.*, 204 Fed. Appx. 553, 556 (7th Cir. 2006) (citing *St. Anthony Hosp. v. Dep't of Health & Human Servs.*, 309 F.3d 680, 694 (10th Cir. 2002); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1169-70 (9th Cir. 2002); *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002)). The EMTALA focuses on disparate patient treatment and therefore liability under the EMTALA is independent of whether any actionable negligence or malpractice exists. *Toretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 174 (3rd Cir. 2009).

### III. DISCUSSION

Plaintiffs allege that Wishard violated the EMTALA by failing to stabilize Joshua Beller's emergency medical condition before he and his mother were transferred. [Dkt. 81 at 19.] According to Plaintiffs, the only way to stabilize Joshua Beller's medical condition was to deliver him.

Wishard contends that it is entitled to summary judgment because (1) Plaintiffs did not "come to" Wishard's emergency department within the meaning of the EMTALA; (2) Wishard provided an appropriate medical screening; and (3) Wishard did not transfer Plaintiffs so it had no duty to stabilize either Ms. Welch or Joshua Beller. [Dkt. 58 at 11.] For purposes of this Court's ruling on Wishard's Motion for Summary Judgment, Plaintiffs agree that Wishard provided an appropriate medical screening. [Dkt. 81 at 2.] Plaintiffs, however, argue that they did "come to" Wishard's emergency department and were transferred by Wishard, which triggered Wishard's duty to stabilize Plaintiffs.

**A. Whether Plaintiffs Came to Wishard's Emergency Department**

Under the EMTALA, Plaintiffs must show that they came to Wishard's emergency department. § 1395dd(a). While the EMTALA does not define the term "comes to the emergency department," the Department of Health and Human Services ("DHHS"), which

enforces the EMTALA, promulgated 42 C.F.R. § 489.24 to clarify the term.[1] *See Toretti*, 580 F.3d at 174.

On June 14, 2001, "comes to the emergency department [meant] with respect to an individual requesting examination or treatment, that the individual is on the hospital property." 42 C.F.R. 489.24 (2000) (amended 2003). The regulation went on to define property as including "ambulances owned and operated by the hospital even if the ambulance is not on hospital grounds." *Id.*

Wishard contends that two exceptions to this definition apply so that Plaintiffs did not "come to" Wishard's emergency department on June 14, 2001. [Dkt. 58 at 15.] The exceptions read as follow:

> [A]n ambulance owned and operated by the hospital is not considered to have 'come to the hospital's emergency department' if (i) [t]he ambulance is operated under communitywide emergency medical services (EMS) protocols that direct it to transport the individual to a hospital other than the hospital that owns the ambulance; for example, to the closest appropriate facility….(ii)[t]he ambulance is operated at the direction of a physician who is not employed or otherwise affiliated with the hospital that owns the ambulance.

42 C.F.R. § 489.24. The Court need not spend much time analyzing these exceptions, however, because at the time of the incident the exceptions did not exist. *See* 42 C.F.R. § 489.24(b) (October 1, 2001). The exceptions were among a number of amendments to Section 489.24 that took effect September 9, 2003, two years after the events giving rise to this lawsuit. [Dkt. 85-4 at 5-6.]

In its reply brief, Wishard acknowledges that Section 489.24 did not address these exceptions to the definition of "comes to the emergency department" and acknowledges that Section 489.24 indicated that hospital owned ambulances were an extension of that hospital's

---

[1] Both parties agree that this Court should defer to DHHS' interpretation of the statute. [Dkt. 58 at 14; Dkt. 81 at 17.]

emergency room.  [Dkt. 97 at 2.]  Wishard, however, contends that the standard practice was to "sidestep" this interpretation to avoid applying the definition of "comes to emergency department" to hospital owned ambulances that served as community-wide emergency response vehicles.  [*Id*.]  While this may have been the standard practice, it nonetheless creates a genuine dispute as to the material fact of whether Plaintiffs had "come to the emergency department" on June 14, 2001 that makes granting summary judgment inappropriate.

**B. Whether Plaintiffs Were Transferred**

If Plaintiffs did "come to" Wishard's emergency department, then under the EMTALA Wishard could not transfer Plaintiffs without first stabilizing their condition.  § 1395dd(b).  Wishard contends that a duty to stabilize Plaintiffs never arose because it did not transfer Plaintiffs as defined by the EMTALA.  [Dkt. 58 at 21.]  The EMTALA defines transfer in relevant part as: "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital."  § 1395dd(e)(4).

According to Wishard, it "did not move Ms. Welch or the unborn Joshua Beller at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) Wishard."  [Dkt. 58 at 21.]  Wishard points to (1) the OB nurse that Paramedic Warren spoke with on the telephone, (2) Dr. Stone of St. Francis, and (3) Dr. Johnson, as directing the movements of the ambulance.  [Dkt. 58 at 20.]

Wishard contends that the OB nurse, who was not employed by Wishard, directed the ambulance to St. Francis Beech Grove.  [Dkt. 58 at 20.]  In her deposition testimony, however, Paramedic Lisa Warren states "that was my decision … to go to them [St. Francis Beech Grove] along with the nurse that I spoke with on the phone said—advising me, said, 'You need to take

her to the closest hospital, appropriate hospital.'" [Dkt. 64 Warren Dep. 41:7-10.] Later, Warren states "[m]y judgment was the closest appropriate hospital was St. Francis [Beech Grove] time-wise and for the assistance for the patient, for the treatment of her." [*Id.* at 48:12-14]. Given Welch's medical condition, determining whether the closest appropriate hospital was St. Francis Beech Grove, St. Francis South, or another hospital required a judgment call. From Warren's testimony, it appears that Warren, and not the OB nurse, made that judgment call.

Wishard next contends that Dr. Stone directed the ambulance to St. Francis Beech Grove. [Dkt. 58 at 20.] After determining that St. Francis Beech Grove was the closest appropriate hospital, Warren called St. Francis Beech Grove's emergency department and spoke with Dr. Stone. The transcript of that conversation follows in part:

> **Lisa Warren**: Dr. Stone, this is Wishard Medic 29. We're, we are on the scene and we're getting ready to leave. I need to know if it's okay if we bring you a 34-week gestation uh pregnancy patient who has a prolapsed cord. She's normally a patient at Methodist. They are advising go to the closest hospital. She is probably a good … six to twelve inches of her cord is out right at this time. I need to make sure it's okay to bring her to you.
>
> **Monica Stone**, M.D.: Um yes you can but we don't have any OB facility here. South Campus does. Where are you closest to, here or South?
>
> **Lisa Warren**: We are the closest to you and we need to get going and they said the closest hospital. We had a pulse on the cord and it's starting to weaken **so I'm going to bring her to you**.
>
> [**Phone hangs up**.]

[Dkt. 88-6 EMT/St. Francis/Dr. Stone telephone transcription (emphasis added)]. This conversation does not definitively establish that Dr. Stone directed the ambulance to St. Francis Beech Grove; nor does Warren's deposition testimony where she states "I remember getting a hold of St. Francis to tell them we were coming…." [Dkt. 64 Warren Dep. 32:11-12.] It is not

9

unreasonable to infer from this evidence that Warren directed the ambulance to St. Francis Beech Grove and Dr. Stone merely acquiesced to Warren's decision.

Lastly, Wishard contends that Dr. Johnson directed the ambulance. [Dkt. 58 at 20-21.] In response, Plaintiffs argue that it is irrelevant whether Dr. Johnson directed the ambulance to the South Campus because Wishard had already transferred Plaintiffs' care to St. Francis Beech Grove. [Dkt. 81 at 21.] The Court agrees. If Wishard's ambulance is considered an extension of its emergency department, then a potential transfer occurred when the ambulance arrived at St. Francis Beech Grove's emergency department. Once arriving at St. Francis Beech Grove, the transfer from Wishard to St. Francis Beech Grove was completed. Any subsequent direction by Dr. Johnson from St. Francis Beech Grove to the South Campus is potentially a second transfer that is not at issue in this Motion.

The evidence creates a genuine dispute of material fact as to whether Warren, an employee of Wishard, directed the ambulance to St. Francis Beech Grove, thereby transferring Plaintiffs as defined by the EMTALA. If Wishard transferred the Plaintiffs, it had a duty to first stabilize them. Wishard does not argue that it stabilized Plaintiffs before any transfer took place. Accordingly, summary judgment is not appropriate.

## IV. <u>CONCLUSION</u>

For the reasons discussed above, the Court **DENIES** Wishard's Motion for Summary Judgment [Dkt. 57].

SO ORDERED.

Date: 06/17/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

10

Distribution to:

Cheryl A. Planck
cherylplanck@att.net

Gerald W. Mayer
gwmayer@sbcglobal.net

Elizabeth Ann Schuerman
BOSE McKINNEY & EVANS, LLP
eschuerman@boselaw.com

Katherine N. Welch Rarick
BOSE McKINNEY & EVANS, LLP
kwelch@boselaw.com
Mary M. Ruth Feldhake
TABBERT HAHN EARNEST & WEDDLE, LLP
mfeldhake@tabberthahn.com

Christopher L. Riegler
HALL RENDER KILLIAN HEATH & LYMAN
criegler@hallrender.com

David Benjamin Honig
HALL RENDER KILLIAN HEATH & LYMAN
dhonig@hallrender.com

John Francis Williams, III
HALL RENDER KILLIAN HEATH & LYMAN
jwilliams@hallrender.com